Our last case for argument today is 24-1346 CORCEPT Therapeutics v. Teva Pharmaceuticals, Mr. Cannon. May I begin? Yes. May it please the Court, Brian Cannon for CORCEPT. Your Honors, Teva chose to copy the exact label with the exact patented infringing doses, but now says, don't worry, we have extrinsic evidence that shows that doctors, it's unlikely that doctors will do what the label tells them to do. Hatchwacks from precedent does not permit Teva to have it both ways. They can't copy the exact label with the exact patented methods and say, don't worry, doctors are not going to follow those methods. Once you copy a label, Your Honors, the generic, in this case Teva, is bound by that label. The FDA anticipated there would be co-administration of these drugs. The invention showed a safe dosage regimen for co-administration of these drugs. The label provides the patented method, and the evidence undisputably shows that in some instances in the past and in the future, doctors will want to co-administer these drugs for the sickest of patients. But not necessarily co-administer them at the claimed dosages. Well, Your Honor, the claimed dosages are on the label. Yes, but I didn't ask you if the claimed dosages were on the label. You've introduced no evidence that anyone has ever administered the CYP3A alongside a 600 or a 900 milligram dose of mifepristone, and that's all you have claimed. So for all I know, the co-administration, the only co-administration that you've established was at 300 milligrams, which is not claimed. Your Honor, I'd like to respond two ways to that. First, under the VANDA precedent, of course it does not have to show instances of past infringement. We look at the label. Right. It doesn't have to. But under Genentech and under VANDA, the court may. And so once the court looks at all relevant evidence, can it not simply credit the fact that even though the label says one thing, there is no evidence of direct infringement in the past? And in weighing that, then conclude that there's no direct infringement. Well, Your Honor, I think if we start with the label, it has both infringing doses and non-infringing doses, and also a doctor may choose not to co-administer at all. This is one of those cases where the pills are sold and then a doctor makes a prescription. The doctor could choose to prescribe just mifepristone. The doctor could choose to prescribe mifepristone with the strong inhibitor. And the issue under VANDA is we do not need to show that all patients must receive co-administration. You do not need to show that, but the district court, even under VANDA, can look at all relevant evidence, which is what the district court did here. The district court did, Your Honor, but the district court erred in a couple of foundational ways. The district court looked at the extrinsic evidence and decided and ruled, as a matter of fact, indisputably co-administration happened in the past and it will happen in the future. But the district court found, essentially, there was not enough co-administration to meet what we believe the district court applied was a prevalence standard. No, the district court did exactly what I just asked you about. It said, well, co-administration, it expressly said, well, co-administration has occurred in the past and may occur in the future, that there's no proof it wasn't occurring at non-infringing level dosages. Your Honor. That's what she said, verbatim. Well, not verbatim. I understand. Your Honor, the issue with proving exact, first of all, under VANDA, we did not have to prove there was exact, exact infringement. What about, this is maybe a little bit different than VANDA, in that here, there's non-infringing uses right on the label, right, and there's been evidence introduced that this method hasn't been used or is, I mean, in that circumstance, do we have to do more and go beyond the label? That's a great question, Your Honor. Can I start with VANDA and then also address the question? Sure. In VANDA, the issue in VANDA was very, very similar to our case. In VANDA, it was a drug, I believe, for schizophrenia, and the drug had about three to ten percent of patients were poor metabolizers of the drug. So the drug was sold, and on the label, it said, doctors test patients, and if the patient is a poor metabolizer, then you do a lower dosage. So in VANDA, there was non-infringing dosages on the label because most patients who received the VANDA drug were not poor metabolizers, so they would receive the drug at the high dosages. It was only those three to ten percent of patients in VANDA who were tested, genotypically tested. It was determined that there was three to ten percent. Right. So for that three to ten percent, they may get the lower doses. So it's similar to our case. The majority of Cushing syndrome patients may not. But there is no percent here. There's nothing indicating that anybody would fall within this regimen. Well in the record. I mean, I could be wrong, but. Well, in the record, Dr. Adrienne Dobbs was an expert for TEVA, and at the appendix 1059-1060, that is the testimony from Dr. Dobbs, and she testified that she had approximately five to six Cushing syndrome patients to whom she prescribed methopristone, and for about two to three of those patients, she also co-administered a strong CYP3 inhibitor. Right. But was it the co-administration at the dosage levels in the claims? The exact dosage levels were not set forth by Dr. Dobbs. So that's not infringement. I mean, the infringement of the claim requires a certain dosage. So the fact that she testified that you could co-administer isn't sufficient to meet the limitations of this claim. But I think, Your Honor, as a Hatch-Waxman case, it's almost like a statistical case. We look forward to the future, like in the hypothetical. It's not proving did it happen in the past. Is it likely to happen? Is it possible to happen in the future? And here, since it's on the label, just like in Vander, the infringing method of genotypically testing and giving a lower dose is on the label here. But if you succeed, if we conclude that because it's on the label, you have sufficed under our precedent to meet whatever is necessary to establish this induced infringement concept, what is the consequence then? The consequence is that Teva cannot market the drug with this label. They could market the drug with a different label. They could do a carve-out and not include the patented method. I think a very bottom-line fact is Teva wants this entire label. They have chosen to copy the entire label. And the Synovian case we cited speaks to that, which is the generic company does not have to copy the entire label. They could carve out the patented method. But here, they want to have it both ways. They want to have the full label with the patented dosages, but also say, don't worry, no one's going to use it. They have not— Why do you think—so here's the deal. The evidence here establishes that if anybody uses this as the patented dosages, it seems to be very few people. Number one, it hasn't been happening. Number two, there's a new drug that might obviate the need for co-administering these things all together, but whatever. So if there's no doubt that mifepristone has lots of non-infringing uses, if there's no doubt that mifepristone can be administered with 300 milligrams without infringing this, so let me just assume, whether you agree or not, that only a tiny or minuscule portion of those people to whom mifepristone is actually prescribed will also be co-prescribed 600 or 900 milligrams. What in the world is the incentive for Teva to keep this on the label? If they could so easily carve around this, why do they want, which is what you just said, this label that has these infringing recommendations on it? What is the logic behind that? Well, I agree with that, Your Honor. The logic is they want to have the ability to have this label. Remember, this- No, but why do they want the ability to have this label? Because the FDA certainly anticipated, and we have evidence in the record, the FDA anticipated that co-administration will happen for the sickest of patients. That's what led to the clinical trials, which is what's led to the invention. In fact, this court affirmed the validity of the invention, saying there was not a reasonable likelihood. Yeah, but the fact that it might happen for the worst patients, I mean, I'm not even going to ask how much you bill per hour. You know, I'm not going to ask how much he bills per hour, but if they could have so easily carved around these two administrations, I bet that as a company, honestly, it would have cost them less than this litigation did. So I'm wondering, what in the world is really going on here? Why did they not just carve around that? Well, I mean, I can speculate. You know, I'm not Teva. Obviously, I don't represent Teva. I think, to me, there's at least ten more years left on the patent, and I think it's highly likely lots of doctors will want to co-administer these drugs together, because ketoconazole, which was the CYP3 inhibitor that was the subject of the FDA memo- So you're saying the fact that they didn't carve out is some sort of circumstantial evidence that they would think that it would be used? Correct. Let me ask you-  I'm sorry. Let me ask you one other thing. Like, is there some sort of procedural reason why they wouldn't have a carve-out, or why they wouldn't have copied the original label? I'm not aware. You know what, they could have copied the original label. That's not in the record that we have. The fact that the original label did not have these reduced doses out of the 2012 label. It's the 2019 label, section 2.5, which is in page 16 of the blue brief, which has the  I will say, when this came up, Your Honor, at trial below, and the issue of, hey, you haven't- when the district court judge said, of course, hey, you haven't given me specific examples of actual infringing uses, Teva did submit declarations to the court. Now, this was after the bench trial, so what happened was the district court said, that's too late, I'm not going to consider it, but when the issue came up below, Teva did provide declarations of- Right, because the district court has discretion to preclude evidence that wasn't provided at the time of trial. That is correct. And we are not appealing that. We are not appealing that issue, Your Honor. And so, tell me, counsel, how this case is any different than Genentech. Thanks for that question, Your Honor. There's three ways I would like to discuss Genentech. First, a label is very different. In the Genentech case, the label said, avoid the two drugs, discontinue using the two drugs, and that is on page 1375 of the Genentech decision. The Genentech label had a prohibition on using the drugs together. There is no prohibition in our label of using the drugs together, and I'd like to add that our label for other situations does have the prohibitory avoid language. In appendix 4254, our label says, do not use mifepristone if the patient is pregnant, or do not use mifepristone if the patient has type 2 diabetes not caused by Cushing's. So our label has prohibitory language for some situations, but not for co-administration with CYP3A. The Genentech label had prohibitory language right at the outset for the dosages. Second, in Genentech, the evidence was doctors had never combined the drugs, despite decades of practice. The evidence in our case, and I hear Your Honor's question and point about the specific dosages, but the undisputed evidence in our case is doctors have combined these drugs. And I will say, the dosages are not that complicated. Each pill is 300 milligrams, so we're talking one, two, three, or four pills. Complicated or not, there's no evidence in this record anybody's ever combined it at the claim dosages, which is all that matters, so I don't see how you distinguish yourself from Genentech at all on your second point. Well, Your Honor, before I get to my third point, I will say, I believe VANDA does not require us to prove, and I understand Judge Wang's point about, hey, why can't the judge look at all the evidence? And yes, the district court judge, of course, can holistically look at all the evidence, but we have to start with the label, and in VANDA, there was a lot of non-infringing uses. In fact, if you go with the 3 to 10%, there was up to 97% non-infringing uses. But here, we do have record evidence, in fact, that the trial court found that... So this is a completely different point. I want you to answer her question, Judge Wang's question about Genentech. You've now pivoted, and you're trying to basically beat a straw man to death. Can you please go through... What's your third point? Number one, two, and now you're at number three. Number three. The reasons for Genentech. Number three.  The third difference from Genentech is in Genentech, there was no FDA evidence. Here we have the FDA, and the Lee memo is sort of the key memo here. That's, I believe, let me get that site accurately, 4450, appendix 4450. In 2012, the FDA said, told CORSEP, there is a high potential of concomitant use, and the study will help provide more therapeutic options available to Cushing's patients. That FDA evidence did not appear in Genentech whatsoever. In fact, Genentech said, the Genentech panel said, you know, that Genentech was speculating about the FDA, what the FDA wanted on the label. Here, we don't have speculation. We have the FDA themselves telling CORSEP, there's a high potential, there's a likelihood, and then in appendix 4300 and 4468, the FDA told CORSEP, there is a likelihood of co-administration. Therefore, CORSEP, please go out, run this trial, check out the drug-drug interactions. But again, you're missing the key thing, which is a likelihood of co-administration. That was of, it was the 300 milligrams. The FDA said, go investigate this for safety and efficacy. But those statements the FDA made at that time were all in the guise of only approving a label at 300 milligrams, which doesn't infringe. That's true. But the FDA asked CORSEP to do that because it was likely, the FDA understood it was likely there would be co-administration. CORSEP did that, did the trials, made unexpected discoveries, unexpected results, filed for patents. And I will say, the patent system incentivized exactly what happened here, which was to give CORSEP protection, and CORSEP discovered and patented this dosing regimen that helped the absolute most. Do you want to save some time for rebuttal? I would like to, Your Honor. Because you've got 16 seconds left. Yeah, I'll give you some more rebuttal time back. I'll restore it.  Appreciate it. Let's hear from opposing counsel. Is it Mr. Rosendahl? Yes, Your Honor. Thank you. Could you start by addressing why there was no attempt to have a carve-out or copy the original label? Your Honor, the FDA regulations require, as a general matter, that a generic drug have an identical label, apart from the name of the drug, of course, to the branded drug. What we're talking about here is essentially safety information, their warnings and precautions. And this was not an issue that was explored at trial, but I think my understanding is that it's pretty tough to get the FDA to allow one to carve warnings or precautions out of a label once the FDA has determined that they're appropriate. So I think that the background rule here is that the generic needs to have the same label as the branded drug. But you can never see any label, right? You can have a skinny label. You can have a carve-out. And the original label, which was approved by the FDA, didn't have the specific table with the dosages that are recited in the claims, right? It's true that the 2012 label, as originally approved, did not have the specific dosages in the claim. I think this is different from a so-called skinny label or carve-out situation, though, because in the carve-out situation, you typically have a drug that can be used for more than one indication. And what gets carved out of the label is one of the indications. So if a drug can be used to treat cancer and rheumatoid arthritis, there's a patent on rheumatoid arthritis, a generic has the option to say, well, we're just not going to pursue that indication. We'll only seek a label that has the unpatented use on it. But that's different from the indication and usage section of the label. That's not the same thing as the warnings and precautions section of the label. Okay, stop. But the warnings and precaution concept that you just threw out there is the FDA won't let us use the original label because, you know, warnings are important. The original label had more warnings, not fewer warnings. The 2012 label gave people many more warnings about mixing misoprostone, especially at any higher dosages, along with the CY3PA inhibitor. So I don't see how your argument makes sense. If your argument was the FDA doesn't want you to modify warnings because warnings are so important, the original label had more warnings, stronger warnings, not less warnings. So why would the FDA have prohibited you from using the 2012 label, which would have allowed you to avoid encouraging infringement and at the same time contained warnings? But Your Honor, first of all, the question of a carve out was not something that was litigated below, and I'm not prepared to make representations on exactly what the FDA would or would not have allowed. I think that the whole premise of the question, though, kind of turns the inquiry on its head. It's not up to TEVA to avoid- Okay, forget about the carve out question. We've got a separate question. We've heard your answer to carve out, but you haven't yet answered why you didn't copy the original 2012 label. That's not an option, Your Honor. The rule is that the label for the generic needs to mirror the current label as a background matter, needs to mirror the label- The current label. The current label. Yeah. I don't think it's an option to go back to some previous label and say that I like that form of words better. I think that the current version of the label- What law do you have on that? I mean, I'm just asking because I really don't know. I'm not trying to trip you up or anything. I just, I want to know why it wasn't done. So if you can help me understand the legality of that, I would appreciate it. So I do not have a specific statutory site, for Your Honor, standing here today. I would be happy to submit a letter with the relevant statutory reference, but it is a background principle of hatch-waxing cases that the label of the generic, as a general matter, needs to be the same as the label on the brand of drug. I don't think there was any dispute about that. You said current before. Yes. Okay. Current. I think the point, though, is that the burden at trial was on CORSEPT to prove both direct infringement and indirect infringement. And in a very carefully reasoned, 47-page long opinion, the district court made factual findings that CORSEPT simply failed to carry its burden of proof on two important elements of its case. One of the problems is this is a hypothetical scenario, this ANDA scenario, because the product hasn't launched, you know, so it's hypothetical. So why would we assume there has to be proof of an actual direct infringement having already occurred? Well, that is not required, of course. It's not necessary to prove that there's been an actual infringement in the past in order to establish that there will be an infringement in the event that the generic is put onto the market. However, the question of past practice, as this Court has recognized in Genentech, is directly relevant to the question of how physicians are likely to behave in the future. And here we had the additional issue that there's a new drug on the market in the form of Acilidrosat, and the district court credited expert testimony to the effect that, you know, whatever people may have thought about the benefits of co-administration of these two kinds of drugs back in the 2012 timeframe when Mifepristone was first approved, now as of 2020, there is another alternative available for treating Cushing syndrome, which is superior for co-administration to Mifepristone because the dosage of the two drugs can be controlled by monitoring the level of cortisol in the body, which is something that cannot be done with Mifepristone. And so with Mifepristone, you have a problem that if the level of Mifepristone in the body gets too high, you have very serious life-threatening side effects, including very low blood pressure, potassium problems. And you can't tell by measuring the amount of cortisol in the blood if the Mifepristone level is too high because Mifepristone doesn't reduce the level of cortisol. It simply blocks the effect of the cortisol on the body by blocking the receptors that cortisol would attach to. And so you actually even have the perverse effect that when you take Mifepristone, people's cortisol levels tend to go up rather than down because the signal to the body that the cortisol levels are too high gets blocked by the Mifepristone. I'd like to ask you a legal question. I mean, I see our cases, we've got cases like Vonda, and we've got cases like Genentech on the other hand. I want to know what statutory support is there for when you're looking at direct infringement for looking at more than the label? For looking at more than the label? Right. Well... Where the statute itself says that the filing of the ANDA itself is the act of infringement. Yes. The 271e says that it's an act of infringement to file an ANDA for a product that infringes the patent or the use of which infringes the patent. And so in this Court's cases, when the question is, what is the product for which approval is being sought? Or the use here, the use, right? Well, I'd like to distinguish between those two, if I may. Okay. I think in this Court's cases where the question is, what is the proposed product? The Court has given controlling weight to the ANDA as the description of the thing for which approval is being sought. And every one of the cases that CORSEFT relies on for the proposition that one needs to start with the label or that the label is controlling was a product claim. So Synovion and Brumonidine and Bayer and Parr, all of those involved infringement by the product that was going to be sold. And the question was, what have you, what product have you sought approval for? However, in cases where the question isn't, what is the product? When the question is, how is the product going to be used? This Court has never hesitated to go beyond the label to answer that question. And that's because of, not the label, the ANDA. Is there any case that you can point to where the Court went beyond the label when the label itself nonetheless instructed the infringing use? Well, again, I take, I don't want to fight the hypothetical. You're not going to be able to fight the hypothetical because I'm asking you that question. So is there any case that's a use case, because you're saying let's distinguish between products and uses. You've sort of given in on the product part, but you're trying to hold it out that this is a use case. So is there any case that you know of where it involved a use, and the actual ANDA instructed the infringing use right on the label? I think Genentech essentially was... No, Genentech said don't do it. It didn't say do it, it said don't do it. I think there was more than one claim at issue in Genentech. Some of them required adjustment of dosages, and some of them required discontinuance of the usage. I'll read you Genentech's label because I've got it right here. Use of fluoxamine or other strong CYP1A2 inhibitors should be discontinued prior to administration and avoided during perfenadone treatment. So Genentech's label actually instructed you not to do it. This label instructs you to do it. Well, but the claim in Genentech, one of the claims that was at issue in Genentech was an instruction to discontinue, was an instruction not to give them together. So that was a way of... But do you know of any cases other than Genentech in answering the question? Is Genentech your only case you have? Well, I think that Takeda and Genentech are both cases that were drug-drug interaction patents, and so they're quite close factually to what we have here. Again, the question is whether you know of any case that involves a use where the ANDA on its face instructs the use, but yet the court went beyond the label, the plain language of the label, to assess whether it would in fact be used if the generic were to go on the market. Well, I don't specifically recall exactly what the instructions were in those two cases. What I can tell you is... On the label. What I can tell you is that Genentech and Takeda are two cases where the question about how physicians were going to use the product was answered by looking at physician practice and was not restricted to the label. And I think that's the closest thing that we have here. And I think that what distinguishes those cases from the other cases that Corseth attempts to rely on, such as AstraZeneca, the downward titration case, or Vanda, the poor metabolizer case, or even Janssen, the recent, the subject of their 28J letter, in each of those cases, unlike here, there was evidence in the record that the infringing use would be inevitable if the instructions on the label were followed. And here we have...  Are you suggesting you have to have evidence? Are you now saying that we need a rule of law that you have to have evidence that the infringing use will be inevitable? No. I'm not saying that. What I'm saying is that one way that one can satisfy the burden of showing that infringement is going to happen in the future is to demonstrate that it is inevitable when the instructions are followed. This is not just an issue of Hatch-Waxman Law. This comes up also... But here, I mean, 271E says the filing of the ANDA is an act of infringement. And if on the filing of the ANDA, if your label actually tells people to administer things in exactly the infringing dosages that are subject to the patent, I don't know why that doesn't just end the inquiry. Well, because this court has said over and over again that although the artificial act of infringement in 271E is enough to create jurisdiction, we don't answer the infringement question by asking solely what does the ANDA say. We ask the question of if the drug is marketed, will it result in infringement? That has... There's a long line of cases saying that. You've already acknowledged that if it was a product, we can look at just the label. That Vanda and others, if it's a product, we can look at just the label. You've carved out this distinction. So you've already sort of admitted that the large swath of cases to have addressed this, which are product cases, are not consistent with what you just said.  I think that the question... We don't have a product to look at yet because there isn't a product that's being marketed. And so we have to put ourselves in the hypothetical future world in which the product is being marketed. And then we ask ourselves, in that future world, does the product infringe or is it going to be used in an infringing matter? And the question, does the product infringe simply by being sold, can be answered by answering the question, what is the product? And the answer to the question, what is the product for which approval is being sought, can be answered by looking at the product specification in the ANDA. And so that has been given controlling weight on that question. But as to the question of how is the product going to be used in this hypothetical future world, the Court has always looked at physician practice. And the important point of Genentech, the key holding of Genentech, is that the burden is on the patentee to establish that there's going to be future infringement if the product is marketed. They cannot simply assume that there's going to be infringement if the product is marketed. And that is the error that Corset makes here. And you can see it on page 33 of your... What is the best evidence that you have, that the District Court found, in terms of fact findings, that would indicate the product is not going to be used in an infringing manner as the label otherwise instructs people to do? Well, I could point, Your Honor, to appendix page 34, where the Court credits the testimony of Teva's expert, Dr. Snyder, that the risks of co-administration outweigh the benefits, especially since the introduction of Acilidrostat. I'm sorry, where is the fact finding? For example, on page 34 of the appendix... I don't see any fact findings. I see her sort of methodically, in this page, going through the arguments and what various experts testified to. There might be a fact finding not on 34, but I don't see it on 34. Well, she's crediting the testimony that the benefits of co-administration... Show me a page and a line number, or a page, where, which paragraph, where. I think you might be referring to the last sentence of the first paragraph. Yes. The Court finds this testimony credible and persuasive that the benefits of co-administering never outweigh the risks, especially since the introduction of Acilidrostat. Thank you, Your Honor. That is the key point, and that shows a conclusion on the part of the district court that doctors in the future, especially since the advent of Acilidrostat, are not likely to use the two drugs together, the Mifepristone and a strong CYP3A inhibitor. That is a key finding. And the point I was trying to make about inevitability, Your Honor, was simply that, and I could also point Your Honor to... So, one problem, this doctor concluded in his personal experience, benefits don't outweigh the risks. Is that really sufficient? And she finds that credible and persuasive. I get it, that he personally would do that. I don't see her explaining that he goes further to say that doctors would not do that, as opposed to he personally wouldn't. Well, I think, I think that when one, one views that statement in the context of the whole opinion, it's pretty clear that she's, she is crediting the point that, that the, the fact of the matter, that the benefits are not going to outweigh the, the risks. And we have other statements, for example, just two pages earlier on appendix page 32, at the beginning of the second paragraph, Dr. Snyder persuasively testified that physicians should be very afraid of co-administration and that it could cause a problem. So, here we have... So, here's, here's my problem. Let me just, let me just walk you through my chronology that's bothering me about this. As of 2012, nobody would consider giving more than 300 milligrams of mifepristone alongside a CY3PA inhibitor because of the extraordinarily dangerous co-administration side effects. So, and that continued, FDA said, go do a study. They went and they did an expensive study. And they came back, and in 2019, they sought and obtained approval for a label. But when did your discovery in this case close? Because I'll tell you when, I know exactly when. When did it disclose? Do you know? There was a close of discovery in, there was an initial close of fact discovery in late 2020, and then they added a new patent to the case in 2023, and there was an additional round of discovery with the final round of expert reports coming in, in May of 2023. So, these, all these Dr. Snyder's, did they come in in May of 2023 or May of 2020? Because... 2023, I believe, Your Honor. Dr. Snyder's testimony came in in 2023? Because I thought it was 2020. No, Your Honor. Okay, I'll certainly look that up afterwards. No, there were supplemental reports that were... Because what bothered me a lot was the idea that, that clearly everyone, including the brand, was saying, don't use mifepristone in more than 300 milligrams until at the earliest 2019. So, it's not surprising that people would be afraid of co-administration. They were saying in their earlier 2012 label, there could be extraordinary problems with co-administration. And all that went away after 2019, up to 900 milligrams. Right, but I think there, there was, you know, three and a half or four years between the time of the, the new label and the, and the testimony at issue. And of course, ocilodroset itself didn't come onto the market until 2020. And so, that was, I think the, the district court clearly found was a game changer and made it less likely than it would have been before for doctors to consider co-administering mifepristone with a strong 538 inhibitor. And in fact, Dr. Snyder, looking at the label, said that the label actually discourages the co-administration of... Yeah, but I, I don't agree with that at all, and I would find that clear error. Well, I, I would submit for the court's consideration, and your honors can find that in, in the district court's opinion, that the changes between 2012 and 2019 to the label were quite, were quite minimal. And in view of the testimony from CORSEPT and the inventor that the 2012 label was a forceful warning against co-administration. Yeah, because it said you can't go higher than 300 milligrams. And it had extremely serious, and all these other adverbs and adjectives in it that were all, almost all removed entirely. And it expressly instructed to go to 600 and 900 milligrams. Wildly different labels. Well, I, I think the record speaks for itself on, on what the differences in the label are. I won't belabor the point. But I, I do think if I can draw the court's attention to page 33 of CORSEPT's opening brief, I think that this kind of crystallizes the problem with CORSEPT's approach to the case. This is where they call out what they say is the very best evidence that they have from their expert on why there's infringement, supposedly on the basis of the label alone. And the question that's asked on page 33 in the block quote is, in your opinion, doctor, in instances where medical professionals determine that it's necessary to co-administer mifepristone and a strong CYP3A inhibitor to a patient who is already taking 1,200 milligrams or 900 milligrams of mifepristone, would a medical professional follow the instructions on TEFA's label? And the answer given by their expert was yes. And our point is the district court found that that was not enough to meet their burden on direct infringement or on indirect infringement. And the district court was correct about that. Okay, counsel, we're way over your time. I thank you for your argument. We're going to give Mr. Chan in a full five minutes of rebuttal time because that's how much Mr. Rosendahl went over. Thank you. Thank you very much, Your Honors. I would like to address some of the points my colleague made, unless you had questions you wanted to start off with right away. Judge Moore, you are correct that discovery, fact discovery closed on October 15th, 2020. Now there was a round of expert discovery because there was the 800 patent was added to the case after the 214 patent. But in the underlying district court docket, docket 180, fact discovery closed in 2020. And you are correct that there was not, it wasn't like there was years and years of fact discovery in order to determine in these rare instances, let's find specific instances of doctors prescribing these drugs, co-administering these drugs at the infringing dosages. One of the points I wanted to raise was the difference between product and method claims because I believe counsel has conceded that for at least product claims, the label absolutely controls and synovium I think is probably the best, one of the best cases for that. I would like to point out that Vanda is a method case. It was a method of treatment case. So I do believe Vanda is a very strong case for us, in fact controls our situation. I don't see a principle difference with respect to looking at a label between a method claim and a... Look, if you're right, we just look at the label, you win. But the district court did not confine herself to just the label. And I mean, he pointed to the very best sentence in the opinion or one of them about Mr. Snyder and her saying people will not give mifepristone at 600 or 900 milligrams plus a CYP3 inhibitor now in light of this new drug that she finds credible that the risks outweigh the benefits. And so it's not going to happen. And so she's making an affirmative finding based on a precise set of facts that this is... I mean, this is where all the marbles are for me. I don't know how I'm going to decide this case. I've given you both a hard time today. Hopefully, he didn't get up thinking super confident after he heard me question you hard because I think I went at him harder. I truly don't know how I'm going to decide this case as I sit here. That's why I'm asking you both really hard questions. But that's what it comes down to. If the label controls, you win. No way it was a warning not to do it. But if the label's not all the controls and I look at the whole of the record, I don't know what to do with all her precise fact findings. I'm not sure what to do with that. To the extent she said the label's a warning, clear error as far as I'm concerned. But the other pieces where she said doctors will not do this, I've concluded that. I don't know what to do with that. May I point you to a couple of other places in the judge's decision, Your Honor, because I believe the judge's fact finding is not as clear and definitive as counsel says. Counsel pointed you to, I believe, the page, I believe it was 32, where the court credited Dr. Snyder saying in his personal experience he wouldn't do it. That's not testimony that no doctor would ever do it, never not do it, excuse me. That's Dr. Snyder. And I think the sentence I want to show you, Your Honor, is first on past infringement. Because the judge, district court judge, made a finding on past infringement and a finding on future infringement. I know, but the past infringement was the people co-administered, but she never made any finding that they co-administered these dosages. And so, I mean, unless you're going to show me this, I feel like this is what you beat your head against the wall on in the opening argument. You couldn't get past the specific dosages requirement. And you kept thinking co-administration wins you the ball game when it does not win you the ball game. Well, I think statistically, Your Honor, there's only four possible doses that you can have, 300, 600, 900, or 1,200. So if we're looking to the future, I don't think the burden is on us to have a crystal ball to say, absolutely, these are the exact dosages that the doctors will have in the  And there is evidence in the record. But isn't it your burden to prove direct infringement? So if both Vanda and Genentech direct a district court in saying the infringement determination is thus based on the consideration of all relevant evidence, and because the drug manufacturers are bound by the strict statutory provisions to sell only those products that comport in ANDA's description of the drug, and ANDA itself dominates the analysis, isn't that telling, Even Vanda telling a district court, you look at all relevant evidence. The district court determines what that relevant evidence is, how to weigh that relevant evidence. So once she has done that, how can you find clear error? Your Honor, may I point you to the fact finding that the district court made on bottom of page 30 across to 31. And this is what the district court said. Crediting Dr. Snyder's testimony, this court finds that while clinicians may exercise their medical judgment to co-administer mifepristone with a strong CYP3A inhibitor in isolated instances when necessary, it is highly unlikely that physicians will practice the claimed methods. Your Honor, this is not a finding that it will never happen. This is a finding the district court found as a matter of fact that in rare cases, it will be necessary, medically necessary, that some doctors may do it. Wait, wait. That's saying medically necessary to co-administer. It doesn't say medically necessary to co-administer at the dosage levels. That's correct, Your Honor. Instead, with the, I think the next clause is the one that relates to the dosage levels, which says it's highly unlikely that physicians will practice the claimed methods. Do you agree with that? I don't fully agree with that, Your Honor, because co-administration of these drugs will necessarily lead to infringement because the record evidence was the majority of the patients are on either 900 or 1,200 milligrams of mifepristone. That's not the, by itself, there's no record evidence here. The majority of people taking CYP3A inhibitors are on 900 milligrams of mifepristone. Show me where that evidence is. That is a blatant misrepresentation of the facts. I believe Dr. Belanoff, Appendix 1164-65. You better be right or you're going to have a short cause order coming your way. I'm sorry. Or you better revise what you just said. Those are your two choices in front of me. If I wasn't clear, I deeply apologize. I believe Dr. Belanoff's testimony was that the majority of, putting aside CYP3A inhibitors, just mifepristone, the majority. Just mifepristone. Exactly. Is this the testimony you say it's at 1164-65? Yes. Yes. And I really did not intend to imply that it was the majority on both. It's putting aside CYP3A. If you have all of the patients, the Cushing syndrome patients, who are on mifepristone. Let me find that. It's 1164 lines 25 to 1165 line 6. That's the testimony that I had in mind, Your Honor. And I apologize if I implied that it was an exact infringing claim here. Because this is not demonstrating infringement. Is there anything else in her opinion you want to point me to that suggests that she somehow scaled back on her later statements about the likelihood of mifepristone at the claim dosages being prescribed alongside CYP3A? The other, from my notes, Your Honor, the other part of the record is in the past infringement, Appendix 29, these are not infringing doses, just co-administration, that the record indisputably reveals that physicians have co-administered mifepristone with strong CYP3A in rare cases. Anything further to add, Your Honor? Anything further to explain? Okay. That's all the time we have for today. Thank you. This case is taken under submission.